in In Re Mushroom Direct Purchaser Antitrust Litigation. Now, I notice, uh, don't have quite so quickly that it appears that you wish to argue the merits before we argue jurisdiction. Would it not be appropriate, uh, that we hear from Mr. Tversky first? It is our preference, unless it would, how do I say this more eloquently, mess up your arguments as planned. If you do not, we can do it either way. I think we would prefer, I know we would prefer to hear the jurisdiction first. Thank you. Goodbye. Good morning, your honors. Martin Tversky for the appellants. We're here seeking collateral appeal under the, uh, Coey Doctrine, which, as your honors all know, has three prongs. We're here in a case involving an immunity, and, uh, we really think there's no question that there's an immunity involved here. I always refer your honors to footnote 21 of Copper Road and to the American Needle case and other cases which refer to the capitals that include in section six as an immunity. And since we're involved in an immunity, and your honors, I would also say that we're here on an absolute immunity. There's no question that to the extent that former members join a co-op, that there's an absolute immunity for any claim that that involves a conspiracy. Let me just perhaps rephrase that. The critical jurisdictional issue is the type of immunity that Capra Volstead affords, correct? Yes. So we have discussed it, we've discussed it in briefs, and I think our thinking has been in terms of immunity from suit or immunity from liability. Now, you know, you're saying absolute immunity. I don't know if that's the precise word, the phrase that we should be using. Okay. But as long as we understand that that is the critical jurisdictional issue before us. All right. The test that your honor just referred to, whether immunity is an affirmative defense or immunity from suit, is set out by the Third Circuit in the Bell Atlantic case. And it says that immunity from suit is grounded in the need to free parties from the costs, burdens, and consequences of having to be a party to an action and to defend oneself. And I would also add that even if we weren't talking about immunity, there was a recent Supreme Court case about a year ago, the Mohawk case, which also talked about, had two tests under the third prong of Cohen, and that is whether or not the issue is a substantial public interest or some particular value of high order. And we believe that we meet the Mohawk test as well. The substantial public interest that was involved here is set forth in our briefs and was well expressed by Senator Caput. Before you get to the public interest, let's go back just a little bit. Digital equipment said that only an explicit statutory or constitutional guarantee the trial would not occur can be grounds for an immediate appeal of right under 1291. So I think before we get to public policy, which may be a third way, the Supreme Court has made it very clear, this is very narrow here, and look to the constitutional or the statutory guarantee. There's nothing in the Constitution. That's correct. What explicitly in the statute or in its forerunner, Section 6, would give you the ground for an immediate appeal here? Well, Section 6 says the organizations or the members thereof are not to be held or construed to be illegal combinations or conspiracies in restraint of trade under the antitrust laws. That doesn't say you're immune from suit. Well, Your Honor, you have to look at the congressional purpose in passing the statute. I think if you look at that, we set out a lot of it in our briefs. It does make it clear that the purpose of the statute was to prevent farmers from joining a co-op from being subject to a lawsuit. But if the statute is clear, do we get to the legislative history? If there's nothing in the statute that gives you the immunity from suit that you're seeking, do we even get to those references in the legislative history that you point to? I believe that you do, yes. When was the Kappa-Volstead Act passed? It was passed in 1922. And how many courts since 1922 have held that the Kappa-Volstead Act provides an immunity from suit? No, I don't think that any court has ever discussed it in those terms, Your Honor. So we're going to be 90 years. We're going to be the first court in 90 years to hold that that act provides an immunity from suit. But when you look at... When the Supreme Court discusses the act in the Sunkist case and also in the Maryland case, it talks about how the members of... In Sunkist, it says, without the business decisions of their officers being held, combinations are conspiracies. In other words, they're not subject to an antitrust lawsuit. Are you talking about Sunkist I or Sunkist II? We're talking about Sunkist I. Because all of the members of the three co-ops were growers there. So, you know, I'm getting into the merits there, but that's a different case. That's correct, and I believe the Maryland case says the same thing. A purpose to make it possible for farmers, producers to organize together their policy, fixed prices, etc., without violating the antitrust laws. Why isn't the Moore-Pennington doctrine an analog? We've held that there's not an immunity from suit. We'd have to strike out a different course here if we agree with your argument. Why should we? Because you have to look at the legislative history and purpose of the Capper-Volstead Act. The Moore-Pennington was a... I think you're on as we're going to the wheat case. The Moore-Pennington was discussed, and if you look at it, there's really no discussion of legislative history, and that's because the Moore-Pennington was basically a common law derivative. And it's very funny, because I read the case yesterday, and I noticed the court in the beginning, when it refers to it as an immunity, has it in quotes. Let's go back to the collateral order doctrine, which is really what we are discussing, or should be discussing here. That is extremely narrow, says the Supreme Court, and is limited to a very small class of cases. Now, all you're really pointing to... I mean, you've given us no case in which they found immunity, and it was found. All you're really saying is, well, there is some legislative history. There's the whole legislative history. But no court has yet addressed whether Kappa-Volstead decisions are collaterally appealable. No, this would be the first court to address that. Judge Hardiman asked you a very good question about when was the Kappa-Volstead Act enacted, and that was 22, and the Clayton Act was 1914. This is almost 100 years ago. This is when settlers were moving westward, and building little farms, weren't they? Trying to... This is before the Depression. It was such a different world then. There's no question that it was a different world, and I think the answer to that is, I forget which Supreme Court justice discussed this, but I think it's the National Broilers case. Maybe it was Justice Brennan, but he says that we have to live with the legislation as it was passed. The fact that times may have changed, and farmers may be somewhat different today, is not for a court to change. A court has to go with what the legislative history was, and what Congress meant to do in 1922 and in 1914. The Congress has had almost 100 years to change its language, to put in what you would have, what you suggest should be in, that you have an immunity from suit. And it hasn't done it. Your Honor, with all respect, I would suggest that you bring the digital case to an end. I don't think that collateral orders or collateral jurisdiction is restricted solely to where the statute explicitly says this is an immunity from suit. I think that when you read the cases, even the Lee case, it doesn't look to whether or not there were those specific words in the statute. Well, I interrupted you early on. You wanted to start off with a public policy argument. I'm going to let you go there now, and I will not interrupt you. Thank you. I always say that. Getting back to the substantial public interest, there was Sifforth in a brief, and Senator Capper, although he said it in 1922, he said that, he talked about how this was, this was extremely important litigation. He said there's no legislation in that kind of which would accomplish greater good for the nation than the passing of the Capper-Volstead Act. But that really doesn't tell you anything of the difference between an immunity from liability and an immunity from suit, does it? All those goals can be achieved by an immunity from liability. You're absolutely right. And I go back to the Bellett-Lanning test, which talks about the costs, burdens, and consequences of having to go through the trial. And when you look at the legislative history, and some of it's set forth by Judge Oreck and affirmed by the Ninth Circuit in the Northern California supermarket case, he talks about, Judge Oreck says, as expressed by his sponsors, the thrust of the bill was to give farmers a fair opportunity to meet business conditions of their times by forming into collective aggregates without fear of prosecution under the antitrust laws. In other words, Congress intended  and farmers had been subject to litigation prior to the passage in 1914 and in 1922 of these acts. The farmers were afraid to join co-ops because they had been subject to conspiracy Sherman Act claims. And the whole thrust of this act was to encourage farmers to join co-ops and to make it known to them that they would not have the fear of having to be subject to antitrust litigation. And if you say that this is an affirmative defense, then what happens is you are subject, you do have the fear of having to go through trial. Even if you are vindicated at the end, you're still not going to want to join a co-op and have the fear of being subject to antitrust litigation. And I would just refer your honors to some other senators and congressmen who specifically talked about that. You're relying on 1922, correct? I have to rely on that because that is... And that's it? I mean, that is... Oh, as opposed to 1914? Well, 1914 and 1922. But there has been no repeal of the Capra-Volstead. And there's no case that says it's not effective. With all respect, it's not... Everything you said strikes me as entirely unobjectionable. So unobjectionable, I don't think the other side would even conceive what you said. But it doesn't seem to address the point that we're pressing you on here, which is a matter of timing. Why not have all these issues aired out after the trial? I mean, you do have, obviously, an immunity for liability if you follow the strictures of the Act. But as I understand it, that doesn't preclude the possibility that a cooperative could run afoul of the antitrust laws by conspiring with members who aren't in the cooperative or with another, perhaps, group of cooperatives. There are myriad ways there might be an antitrust problem. So why shouldn't these issues be aired out in the final analysis in trial court without us jumping in Mayday's race here? Okay. Let me see if I can make it more clear. I think that the reason is because the whole purpose of Section 6 in the Capitalist Act was to encourage farmers who were leaving their farms due to agricultural depressions, who were unable to cope with middlemen, who were unable to make a living. The purpose of the Act was to encourage farmers to join co-ops. And farmers had been subject to antitrust litigation. And farmers had to know that when they joined co-ops, they would not be subject to lawsuit. Does that apply to middlemen who joined co-ops, too? No, Your Honor. It applies to farmers. Isn't that one of the issues here where there's a middleman? You see, the problem I'm getting at is, and this follows up on the previous inquiry by Judge Hardiman, is that sometimes, you know, this immunity question is intertwined with the merits, which could be the case here. And I think that's one of the reasons why, you know, the North Pennington immunity is not a good candidate for a resolution early on. Because, you know, for instance, we have the sham exception, right? And so, you know, when it's intertwined with the merits, don't you think it's less reason to try to resolve it on appeal pre-trial? Your Honor, what the court below did, though, does not have anything to do with the merits. It had the court found that, or very little to do with the merits. And as you know, the Fort Stark case says that even immunity has something to do with the merits. It's not completely clear. The court found immunity was destroyed because of the membership of M. Katong Chelsea, for one thing. I mean, the court didn't discuss these issues that we're discussing now. I understand. I was trying to respond to the question about whether or not it's involved in the merits. But what the judge has said is that because of the Chelsea situation, we don't have a co-op of producers. We've lost that antitrust immunity, that absolute immunity, that when farmers get together in a cooperative, they are not subject to a conspiracy claim. And the judge has said, well, you have a member here who's not a farmer, and therefore you have lost that immunity. And, Judge Hardiman, just to go back to answering your question, I don't have time to read all the legislative history, but just to quote your honors to some of it, Senator Capa recorded a brief. Senator Kellogg, who introduced the act on February 2, 1922, talked about how he had been involved in it, mostly in the Sherman Act, and in some cases went three or four years. And courts found them to be illegal in some cases and in other cases legal, but it was only after the end of expensive litigation and he pointed out how that expensive litigation has been harassing to the farmers. And Senator Lewis, in 62 Congressional Record 2259, pointed out the very same thing. We're familiar with what legislative history there is, and there actually have been, I think the figure is something like 20 Capper-Golstad Act cases since 1922, not dealing with the precise issue before us. So there has been, I think you're almost suggesting there's been nothing written about Capper-Golstad since it was enacted, and there has been some substantial writing in a limited number of cases. So it's not an entirely clean slate here. And we've given you an awful lot of time. Because we changed the order of argument, and I don't think the rebuttal time has been preserved. Are you, which of you are reserving rebuttal time, or is no one? Well, we were both going to reserve rebuttal time. Well, why don't you do it? How much rebuttal? We wanted to take two minutes. I'll give you two more minutes, and you will have had a lot of time. And Ms. DiStefano, how much time did you have? I think I reserved two minutes as well, but does the court want to hear both sides of the argument? Yes, I think if that would be... Both sides of the argument? I think that makes sense. Thank you. Thank you. May it please the court, my name is Patrick Grafson, and I represent the direct purchaser class, and I'm going to be arguing today on behalf of all plaintiffs. And I'm going to address the jurisdictional issue that we just heard from the defendants about. The premise of the defendant's argument on jurisdiction is that the Capra-Volstead Act provides absolute immunity to members of the cooperative. That's just not true. The general rule in price-fixing cases like this one is that price-fixing is per se illegal under the Sherman Act. The Capra-Volstead Act provides a very limited immunity from that general rule. Like all exceptions from any trust liability, it's construed very narrowly, and the only thing it allows is for farmers or growers to organize cooperatives without the fear of liability from the mere fact of organizing. It doesn't apply if a single non-grower participates in the cooperative, doesn't apply if farmers act predatorily, and the Act provides very specific requirements for how the cooperative is organized and the voting rights for the cooperatives. If any of those requirements aren't proven, the general antitrust law applies to the naked price-fix. Now, why can't those questions be determined pre-trial? They might be determined pre-trial. As the district court did here, in being separate from the merits, why isn't it a proper subject for a collateral appeal? Well, as we said, as the court raised with the defendants, the collateral order doctrine is very narrow. The issue is whether the particular right at stake involves an immunity from the burdens of trial as opposed to just a defense to liability. There are all kinds of rights that are decided pre-trial by the district courts. Partial summary judgment is granted all the time, but those partial summary judgment rulings don't come up as collateral orders unless they deal with a very specific kind of right involving an immunity from the burdens of trial. Well, here, though, Judge O'Neill decided the merits of the Capitals Act defense, and he basically said there is no defense because one member was not a grower, and therefore the immunity or the exception does not apply. So it's your understanding, I would think, that the Capra-Volstead Act will not be a factor at trial? I don't think he determined exactly what's going to happen on trial. Well, he found there's no Capra-Volstead Act exemption. That's correct. So therefore, what, with reference to the merits, is left to decide at trial? There may not be anything specifically related to the Capra-Volstead Act, but there might well be issues that are decided on the merits during trial that are relevant to that defense, and they'll be very valuable in the final record when this case is appealed from a final judgment. Well, how is that going to happen? He's decided that there's no Capra-Volstead Act at trial. Well, but they're still going to get trial on the substantive issues in the case, like whether there was predatory conduct, who these cooperative members conspired with, and that's all going to be in a final record. There's really no dispute here of the facts that were necessary for Judge O'Neill's decision. There is none. There's no dispute over the facts relating to those distributors that he relied on. That's correct. I don't think the defendants raise any factual disputes. Judge O'Neill looked at three of the defendants, or three. Let me just put it more succinctly. The Capra-Volstead Act is out of the case for purposes of trial. So I would like to know how that is involved with the decision on the merits. Well, that doesn't mean that the issues, the factual issues relevant to the defense are out of the case at trial. But I would say, since the defense tries to marshal the facts and evidence surrounding how M. Cutone Chelsea became part of the cooperative, i.e. clerical error, misnamed company, et cetera, et cetera, or perhaps they want to put in all kinds of evidence regarding the family business aspect of that entity, you're not going to resist that and say that's out of the case. It's not tremendous because that issue has been adjudicated already. That's not my point, Judge Hart. I mean, I do agree with the court that the issue of Capra-Volstead immunity is out of the case. My point was that there would be a much more complete record on the issues relevant to the defense if we wait, as we ordinarily wait. That's what I'm asking, though. I want to make sure that's the case because if the other side's not going to be allowed to marshal that evidence relative to the issue of M. Cutone, then wouldn't judicial economy favor us dealing with the decision now? Because nothing's going to change upon remand. We don't already know on that issue. I think that's where I disagree with that issue. There will be more in the record, not only the issue about M. Cutone and the other distributors, but there will be more in the record about the substantive conduct. But M. Cutone alone defeats immunity. I agree with that, yes. If we were to agree with Judge O'Neill that M. Cutone alone defeats immunity, that's it, right? But let me ask a question this way. I mean, for instance, you agree it's possible that if there is a trial and gets a trial and some evidence comes out, if there is no interlocutory appeal on this issue, then the plaintiffs at some point before the judgment issue say, well, ask the trial court. We want to ask you to reconsider your ruling on Capra-Volstead based upon the new evidence introduced at trial. Why not? We can first decide that we, under your view, we can first look at the Capra-Volstead Act of Immunity after a final judgment in this case, which would be after a full trial in this case. Then we can first look at the Capra-Volstead immunity question, correct? Yes. That's sort of the third part of Cohen. It's not effectively unreviewable. No. Well, I think you're right. That's right. It's not effectively unreviewable. It is reviewable. But I'm speaking for myself. Why would we require people to go through all kinds of time and expense if the issue is fully joined and that issue is a hermetically sealed unit at this point and it might give all of you and your clients a more timely and less expensive resolution? Because that's not the way appellate jurisdiction works. We take appeals from final orders, not from collateral orders. There's a very strong policy against piecemeal appeals. We don't know what's going to need reviewing in this case. Whether or not it's effectively unreviewable from a final judgment depends upon what the purpose of the immunity is, in other words, what it's designed to protect. If, as the Supreme Court has said in another context, the immunity is designed to shield the person from going to trial, then it is effectively unreviewable after the trial has already been completed. So whether it's effectively reviewable or unreviewable depends upon the purpose of the immunity. That's correct. Here, there is no legislative history and there is no Supreme Court cases that say there's an absolute immunity from the Capra-Ballstead Act. This is just a defense to liability. We think that this Court's opinions in both the Wee case and the Robinson case are directly on point. And resolve this case. There's no legislative history. In fact, in both the Robinson and Wee, this Court noted that it found no private defenses, and that's what this is. It's a defense to private defendants in which the immunity was an immunity from the burdens of trial. So if this Court finds that this particular right, the Capra-Ballstead Act, is immediately appealable as a collateral order, it will be the first private defense that this Court has found that involves an immunity from the burdens of trial. And there's no reason to break that ground in this case. Unlike the statute of repose in the Robinson case, there are a lot of exceptions to the Capra-Ballstead Act, and those exceptions are factual issues that must be proven. So there's no information to make this an absolute immunity. The very exceptions to the Capra-Ballstead Act need to be litigated. And the Supreme Court on two occasions has specifically said in the Borden case and the Maryland and Virginia case that the Capra-Ballstead Act is not a complete immunity from jurisdiction, and has said that the trial courts have jurisdiction over these Capra-Ballstead cases. And I guess most persuasively, the EMFC defendants here are not asking this Court to enter somber judgment in their favor and saying that this Court should end the case that they're entitled to an absolute immunity. All they're asking this Court to do is to reverse Judge O'Dell's order, send this case back down to the trial court, where presumably there's going to be more trial on the Capra-Ballstead Act. So it's not bringing this case to an end, and not only on the issues that Judge O'Dell decided, but the others. Well, if we finally don't have jurisdiction, there's no trial on the Capra-Ballstead Act, because he'd thrown that out, right? No trial on the Capra-Ballstead Act, that's right, but a trial on liability and damages which have not been decided. Well, what are the other causes of action here besides the Capra-Ballstead Act? Look, the Capra-Ballstead Act doesn't provide the cause of action. It's a price-fixing case. It's a Section 1, and it's also a cause of action under Section 7 of the Blatant Act.  Yes, Your Honor. And what doesn't go to trial is what you would classify as a defense, right? That's correct. I mean, that's out of the case. It's for purposes of trial. That's correct, and that would remain presumably until the end of the case, and at the end of the case, all the errors in the case could be raised and brought to this court at the end with all the allegations, any allegations that the defendants may have made. And if we were to accept that there were errors, then they'd have to try it all over again. Yes, and that's the way our jurisdiction works under 1291. I'm not sure exactly how we're breaking up the time. I see a lot of my time has gone. As you can see, we're pretty casual. But I do think that the jurisdictional issue should be the end of this case, that both the Wee case and the Robinson case are directly on point. They dispose of this case, and the court should not reach the merits based on this jurisdictional defect. And I'll address the merits after Mr. DiStefano. All right. Thank you. Thank you. Mr. DiStefano. Do you want a point of rebuttal? Oh, we're going to have a rebuttal. Yes, forgive me. I'm going to hold you to your two minutes. I think you were honest right on ahead when you talked about how there's been a conclusive determination here, and that's very important, because Judge O'Neill has taken away the CAPA or Volstead defense, the very act that allows farmers to come together and to join a call, and that's crucial. And whether or not there may be other evidence or other causes of action later on is addressed by the Supreme Court in Barrett's case. And most importantly, it's also been addressed by this court in the Federal Insurance v. Richard Rubin case, where the very same argument was made that in connection with sovereign immunity that the district court had not reached other possible issues involving sovereign immunity. And this court said that the focus on whether a decision will conclusively determine the immunity question is misdirected because the inquiry regarding the conclusive determination of the disputed question looks to what the district court in fact did rather than what will be the consequence of the outcome of the appeal. In other words, here the district court has determined that we no longer have a CAPA or Volstead immunity. It is conclusive. The court has given no indication that we will ever revisit it. And therefore... Well, let me just play devil's advocate. In digital equipment, the Supreme Court held that the collateral order doctrine did not permit immediate appeal from a district court's refusal to enforce a settlement agreement provision that protected a party from suit. Yes. What's the difference between that situation and this? The difference here is that the whole purpose of the act, the whole body of legislative history is directed at providing an immunity to farmers. In digital equipment, the Supreme Court recognized that an interest is in some sense irretrievably lost almost every time a district court enters an order such as was entered here. And that did not give the right for an interlocutory appeal there? I'm not sure what to say other than, again, the act is destroyed if there's no interim interlocutory appeal. If farmers are subject to litigation at the expense of litigation, and I can say more legislative history, by expense, it's all over the legislative history. If farmers are forced to go through the expense and not have an immunity issue determined early on, then the whole purpose of the statute is void. Thank you. I think we understand your argument. Thank you. Thank you. Let me just start off by picking up on something that you raised, Judge Barry, in a different context. But having to do with the Capital Volstead Act being 1922, and here we are almost 100 years later, I think apropos to that, and apropos to the merits of this case as well, which I'm going to focus on and not talk about jurisdiction, because that's been well-argued by both sides, is that Justice White, in National Voters, says this. Actually, quoting and approvingly quoting from a law review article from the University of North Carolina Law Review. He says the important reasons for granting antitrust immunity to farmers have not changed. This is 1978. A little bit closer today than 1922. Their produce is still, in large part, incapable of being withheld for a higher price. The produce has to be sold. They rate lots, if you have, let's say, a week with respect to mushrooms. The overwhelming demand is for fresh, not frozen. Now, he was talking about chickens, but the same is true, I would submit, for mushrooms. And their produce must be sold within four days of slaughter. The same is true of mushrooms. The result is a buyer's market, and the buyers in this market are few and powerful. They're dominated by large retail chains, such as A&P, Kroger, Safeway, and institutional outlets, such as Kentucky Fried Chicken. Now, this is back in 1978, but if we bring it a little bit more closer to today, I will point out to the court that the National Department of Natural Agricultural Statistics Service, abbreviated NASS, collects all these data that the court can take judicial notice of. And the top five retail buyers, the top five retail supermarket chains, Walmart, Kroger, Safeway, Super Value, and A-Hold, account for 61% of the retail sales of agricultural products. Let me just put a little asterisk on your national broiler case. There was no exemption under capital that stood there. Because in spite of what you said, nine members were not farmers. And you're supposed to argue the merits. So maybe you can tell us why we shouldn't pay attention to national broiler on the merits. Oh, no, no. You should pay attention to national broiler because national broiler helps our case. What we have here is a group of historic farmers who basically added abilities, added downstream abilities, to do two or three things that were necessary to get their product to as far as they could into the closest they could to the ultimate customer. They added packaging. They added cooling. They added sorting. And they added delivery capabilities. Okay. In that sense, they were vertically integrated downstream. And they never got to processing. They never got to processing. Processing, frankly, with respect to there's different kinds of agricultural products. Chickens have to be processed because nobody wants to buy a lot of chicken anymore. Maybe there's a few markets out there that sell them. They have to be cut. They have to be dressed. They have to be killed and whatever. Lots of other agricultural products don't have to be processed. I hope they're killed before they're cut and dressed. I think so. In any event, tomatoes, mushrooms, and the like. Wheat has to be processed. All grains have to be processed. So, in National Broadway, the court was talking about something that was occurring in a type of agricultural commodity that had to be processed. But the analysis is true. It basically said, we have three members of this trade group that engage in no farming activities either directly or through wholly-owned subsidiaries or commonly-owned subsidiaries. All they do is process. You know, I've well-analyzed it. Tyson and Purdue are two huge, dominant chicken processors who have, in some cases, integrated backwards, downstream, upstream, I'm sorry, into the chain to acquire land and whatever have you. And all the court held in National Broadway was that because of these three processors... I think there was nine members. Whatever. Nine members who were not engaged at all in any farming activity. They left for another day a more interesting question. The more interesting question is, what about a totally integrated guy who grows the bigger flock and the chickens and goes all the way through processing? That's enough for another day. And they also talked about another question that had to do with partial backwards integration. And I think what's important in terms of the Capital Goals Act is the difference between a processor or a supermarket who was the villain back in 1922. There weren't supermarkets, but there were processors. It was the villain integrating backwards, upstream, into farming, or a historic farmer who basically decided to integrate a little bit forwards or a lot forwards. Now, after all, the Capital Goals Act specifically not only authorizes that, but suggests that that's what farmers ought to do. Why don't you go back to the basis of Judge O'Neill's ruling, which were two on the merits. Yes, yes. Specifically. Chitone, and then we, Banfordini, Kaolin South Oil Distributors. Okay. But I have to set the stage just a little bit more. Okay? You've got one minute and 29 seconds, so unless we, out of the goodness of our hearts, we give you a lot more time. Thank you. There's all these labels floating around out there. There's farmers, there's producers, there's middlemen, there's distributors, there's processors, and there's others. Judge O'Neill, respectfully, great judge, lost his compass a little bit by focusing on these labels. And I'll tell you why. First of all, it's absolutely 100% clear that owners of farmlands are considered to be farmers under the Capital Rules of the Act. You don't have to actually farm the land. All you have to do is own it. And secondly, you have to receive part of the crops as part of the consideration. All right? What he didn't apprehend, although he made these findings in his opinion, was that Michael Chitone, who was the actual member of the EMXA... That's your argument, that Michael Chitone was the real member. That's not what Judge O'Neill found. But that was a fact, an uncontested fact before. He didn't stick it into his opinion. The only thing that was an uncontested fact was he signed the application. No, it was Dad signing the application. Well, it's not uncontested that he was a member, was it? The member was M. Chitone Mushroom Company, Chelsea. That was the member. That was the... Member. That was the company that his dad, Mario Chitone, put under his name on the... That was the member. Michael Chitone attended the meetings on behalf of the member. But the member, the one that Mario Chitone put on the... was the Mushroom Company. Under all Supreme Court jurisprudence, that company had an absolute right to be a member. Why? Because it was part of a single entity of family-owned companies. Well... Didn't compete with each other. While getting into American Needle and... But didn't the trial court find, as a matter of fact, that it was a processor? It may have said that, but it was incorrect. It was a distributor-owned district court company. I mean, those are findings. I mean, it may have been incorrect. You're saying it's... It's back to going to these labels. I'm interested to hear why it was clearly erroneous for the trial judge to have found that M. Chitone Chelsea was a processor. Because the facts that were before the district court and before you, and we laid out the facts again and cited back to the record where they were, indicate that both Mario and Michael were in fact owners of the farmland who had received the crops from the farming entity as part of the consideration. That fact alone entitles either or both entities to be a member. Secondly, you can look at it this way. You can look at it that, under the Capital Homestead Act... Well, you can look at it by employing a comparable American needle analysis. You can look at it by the facts that were before the court indicating that Michael Chitone, Mario Chitone, Mario's wife, and Michael's two brothers  in a group of companies. The group of companies weren't competitors. The group of companies were all engaged in some level of agriculture. One company grew, the other company packaged and shipped. Yeah, but the Capital Homestead Act provides persons engaged in the production of agricultural products as farmers. And the Supreme Court has interpreted that language in all of its cases, but specifically in Sunkist, in the Case Swain-Sunkist case, which we're calling Sunkist II, and specifically in National Broilers, to include farming entities that were downstream, vertically integrated to some extent or to all extent. In National Broilers, they left that question open. But in Sunkist II, they declared that it was not a cooperative within the meaning of Capital Homestead because some of the members were not actually growers. Independent, right. They were independent. All they did was process. They turned oranges into frozen concentrated orange juice, and that's all they did. They had no affiliate or owner or entity that actually grew the oranges. All they did was buy oranges from farmers and turn them into concentrate. And that 15% of the members started. But there were other members in Case Swain as well. There were members that were fully vertically integrated. Okay, so that's your argument as to Michael. Now, can I hear your argument as to Judge O'Neill's other ground? I think the South Mill distributors are fairly easy. You have the farming packaging entity in Pennsylvania that wants to sell its mushrooms in Dallas, Houston, New Orleans, and Atlanta. So the farming entity finds an old college roommate and says, would you go down there and sell my mushrooms pursuant to a contract, which I'm going to enter into with you. And by the way, I'll give you 50% ownership interest for your trouble in moving all the way down to Dallas and doing all this work. Capital Bolsthead. Now, Judge O'Neill said, that's an outsider. We maintain that that's not an outsider if he's paying correct attention to the Capital Bolsthead Act jurisprudence. Why is that entity not an outsider? Well, first of all, the Capital Bolsthead Act section one specifically says, such associations or their members may have marketing agents in common and such association and their members may make the necessary contracts and agreements to affect the purposes of, and you have to relate back, processing, preparing for market, handling, and marketing mushrooms. That's all that was done here. When you strip it down to its simplest form is, is that the growing packaging entity in Pennsylvania had a marketing agent in Dallas and Houston and New Orleans and Atlanta and it entered into a contract with the marketing agent, specifically authorized and approved by the Capital Bolsthead. How could that person be an outsider for purposes of stripping an entity? We submit that he can't by the very words of the statute. The second way you can get at the problem or the issue is by the American Needle German Tennis Federation cases. Judging on the other side of the case, neither the Eighth Circuit's decision in American Needle, the Supreme Court's decision in American Needle, nor this court's decision following American Needle in German Tennis Federation were yet decided. Judge O'Neill felt that for the Copperwell Doctrine to be invoked, there needed to be 51% at least ownership and that amount of control between the two entities that were being claimed as a single entity. American Needle, both at the Supreme Court level and the Circuit Court level, have basically said... I'm going to give you two more minutes. Basically said, now, you can have joint ventures. You can have totally separate companies. That's not the test. The test is as follows. The test is, and I'm boiling down to the questions because I only have two minutes, but the test is, do these two joint ventures compete with each other or are they simpatico? Here you have... and the same is true as Manfredini. So I'll basically say everything I'm saying about Kilroy when it's true for the Manfredini thing. But one entity grows and the other entity packages and ships. You can't grow without somebody who's going to package and ship it. Why? Because the customers won't buy it any other way. The villains, the Safeways, the Krogers, or whatever, under the Capital Goldstead Act, I'm not calling them literal villains, but I'm using them and being a little bit alliterative. And secondly, they're engaged. It's like franchisor, franchisee. It's like lots of examples that the Supreme Court used in American Needle. Secondly, Judge O'Neill did not employ that analysis. I think the case, at minimum, has to go back to Judge O'Neill to employ that analysis. Secondly, American Needle jurisprudence basically says you've got to do another thing. You've got to find out whether the restraint... You have to look at the restraint that's in place by these two companies acting together is a bad thing under the rule of reason. Now, there's lots and lots of cases on this. The rule of reason boils down to does the one company have a sufficient-sized market share that we have to be concerned with something called intra-brand competition? And I submit to you that under the uncontested facts of this case, that doesn't happen either. The error was not necessarily that he... It was that he didn't employ the test that American Needle says he should employ. That argument basically refers to and encompasses both the so-called Southern distributors and Manfredini. In Manfredini's case, there's another argument. There's also the words of the statute argument. While the Thomas distributors cannot be said to be owners of any farmland, dominant Manfredini owned the farmland, and his wife owned the farmland upon which all of these mushrooms by LRPM and LRP, which is his nephew, basically, are grown. That qualifies it. Thank you very much for your time. Mr. Russell. Thank you, Your Honor. I want to briefly address the merits of the case in the event that the court finds jurisdiction. The issue on the merits of this case are relatively simple. This case doesn't involve the issue that was left open in National Broiler about the treatment of integrated farmers and other people, growers that integrate so far into the processing or distribution that they lose their status as growers under the Capra-Bolstett Act. We raised that integrated issue in response to the defendant's motion for summary, judging it down below, but Judge O'Neill didn't reach it. The only issue here is the same one that the Supreme Court decided in National Broiler, and that is, does the EMMC contain non-growers? And on that issue, the facts are undisputed, and in response to Judge Hardeman's question earlier, it's not a clearly erroneous standard. This was a motion for partial summary judgment, so the facts were undisputed that the EMMC contained non-growers. The three that Judge O'Neill looked at were MQ-Tone, Manfredini, and the South Mill distributors, and there's really no dispute on the facts that those were independent companies or separately incorporated companies and that they were distributors. The defendants raised some arguments about why they should be considered to be growers, and I should point out that there were also four additional entities where the plaintiffs believed the facts were undisputed that also would destroy the capital of Allstate Immunity because they either were members in the EMMC or they agreed with the EMMC to fix prices. But the question is whether they come under that general Copperwell rubric, right? The single center of economic power or something like that. Yeah, that's what the defendants say is that you should look at this very loosey-goosey to say that they're one independent entity, and I'll only address that argument. I think there are four reasons why that argument doesn't hold water. The first is that for many of these pairings that they look at, they can't establish that unity of interest. At the most that they can find for the pairings is at 50%. Well, let me put M. Q. Tone aside for a moment and talk about the other two, South Mill and Manfredi. For those pairings, all they can identify is a 50% common ownership interest. The most that they can determine is a 50% common ownership interest, and that's not enough under any case law to say that as a matter of law they're a single economic entity. There's not one member in that controlling. It brings together independent people conspiring, and in fact, American Needle said you don't look at just labels, and they found a joint venture to actually be capable of conspiring in the American Needle case. So here we only have a 50% common ownership interest. That's clearly not enough for them to be a single entity, but more importantly, this decision is being made in the context of the Capra-Volstead Act. The Capra-Volstead Act says as a matter of law that growers and distributors have different interests. What the defendants are asking this court to do is say that even though the Capra-Volstead Act clearly says that they have separate interests, they should be regarded as a single economic entity so that distributor interests can be brought in to the Capra-Volstead cooperative. There's no case that says that. That's not in any of the case law. What the case law says is distributors are prohibited from participating in Capra-Volstead cooperatives. What if the distributor is wholly owned by the grower? That's not the case for most of our cases. I understand that. I'm trying to learn. There's no case that I know of that addresses that issue, but I don't think in that case that that distributor should be allowed to participate in a Capra-Volstead cooperative because of the strong policy against allowing distributors to participate in the cooperative. That policy is so strong, that absolute prohibition against distributor interests from participating in the cooperative, that I think in that case if you had separate entities... Wouldn't they know the distributor is the grower? Well, I don't think in that case it would be the grower. I think they're separate. I think that was Judge Hardin's question. Well, it's wholly owned. It's vertically integrated downstream. I think you're depending now more on the formalism, aren't you? Doesn't that clearly come under the Copperwell? It's a wholly owned subsidiary? I don't think it's a formalism, but that is the issue that was left open in National Boiler, is what happens when you completely integrate and you have processing and distribution. That's the issue that National Boiler left open. And Justice Brayman actually had a four-part test that he suggested to deal with that question. We're not arguing for that test in this case because we don't think you need to reach that issue. But I suppose that would be a situation, Judge Hardin, where you have to look and see if you agree with Justice Brayman's test for determining when completely integrated companies abrogated the immunity because they became more like distributors than they were growers. I think that's an open issue. In my opinion, that's something that you don't need to reach. Let me address this issue about the family members. In this case, you have a number of EMMC members where the grower is owned by one family member and the distributor is owned by another family member, and the defendants say in that situation they should be regarded as a single entity under Copperwell. That's not what Copperwell says. Copperwell doesn't deal with family relationships. Copperwell deals with economic relationships and economic control. And family members, as Judge O'Neill recognized, do not always have the same economic interest. Two brothers might have very divergent economic interests and yet come together to conspire under Section 1 of the Sherman Act. Nothing that I know of says that family members should be regarded as a single economic entity. And the last point I want to make on this Copperwell issue is even if you find that certain parents are a single economic entity, like Manfredini and LRPM, that doesn't mean that the distributor can participate in the EMMC, the agricultural cooperative. All it would mean is that Manfredini and LRPM can't conspire with each other. It doesn't mean that Manfredini can conspire with the EMMC and all the other members of the EMMC to fix prices. So we don't think that this Copperwell argument justifies expanding the exemption that is the Capital of All Set Act. Let me go back to the argument that the EMMC is making that agricultural members, members of a cooperative, should have automatic immunity even if the cooperative contains a wrongful member. That's an argument that's 100% contrary to what these defendants argued in the district court. When these defendants asked for phased discovery, they told Judge O'Neill that they would be individually liable as members of the cooperative if the cooperative was found to have non-grower participants. We now found non-member participants and they say, well, it doesn't matter whether they're non-member participants. In addition to being contrary to their argument down below, it's completely illogical. What the defendants are arguing is that even if they can't establish the elements of this very limited defense, the members should get the benefit of the defense anyway and that the cooperative as an entity can be liable for conspiring... I'm sorry, they're arguing that the entity as an entity, the cooperative as an entity, can be liable under Section 1 of the Sherman Act, but the individual conspirators cannot. That doesn't make any sense and that's not what any of the case law says. So you're going to go after each of the individuals? We have sued some of the individual members. We sued the individual members of the cooperative. Matter of interest, what are your damages here? I know there's something in the record. We haven't gotten to that stage. I can't give you a number because we don't have an expert report putting that in. I don't want to be bound by that number. It's hard to say, but the price range was... over a number of years, and the market is about $800 million in mushrooms a year, so it might be something like $48 million a year for the length of time of the conspiracy, but that hasn't been calculated by any experts. So the poor, innocent growers are going to have to foot that bill? Well, they increase the price of mushrooms by their own admission, by 8% a year by their conduct, and the consumers have had to face that increase in mushroom prices. Okay. I see my time is up. The direct consumers passed it on. Well, yeah, I should say that the direct purchasers, and I represent a class of direct purchasers, and as Your Honor knows, under the antitrust laws, the direct purchasers have standing to sue for damages regardless of whether they get passed on under Illinois Barrett. Thank you very much. Thank you. I think, Mr. Stefano, you've got your last two minutes. My last two minutes. I'll try to pack as much into the last two minutes as I possibly can. That's an important point that Mr. Webbs and Mrs. Rebuttal raised that I didn't have time to raise, is that the individual growers ought to be exempt under circumstances that were before the court, but which the court didn't really consider. Now, keep in mind, the court entered a summary judgment as to immunity, and so all the case against the individual farmers, the individual defendants as well, all defendants in this case. Now, what the court did not, it was factually before court, I'm arguing today on behalf of the appellant in 2258, which is Mr. Bassiani, as well as the national, the amicus brief counsel for both entities are here, but they graciously gave me time that they might have on their own. The prime example is Mr. Bassiani. He joins a co-op. He does it in good faith. They hire counsel to do due diligence and whatever have you. He drives down the street and passes Michael Cotone's farm and sees him out there growing mushrooms. Michael Cotone's dad, Mario, had a farm before Michael did. You know, there's lots and lots of evidence that what these individual members did was join in good faith. Now, is Mr. Rustin accurate in his portrayal of Rodney? In the district court and in this court, we argued in some government papers and we had unresisted material issues of fact that we submitted in the district court, making the argument, and as did Mr. Bassiani, that individual members ought not to be liable. He just didn't address that argument and it ought to be reversed for that reason. Secondly, Your Honor, I think... Your time is up. Okay, my time is up. Is there anything you must say as a second thing? That I absolutely must? No. Okay, thank you. The case was extremely well argued. We will take it under advisement. Thank you.